UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO.: 5:05cv123-R

DAVID NICKELL, HEARTWOOD
REGIONAL ASSOCIATION OF
CONCERNED ENVIRONMENTALISTS,
and JACKSON PURCHASE AUDUBON                                    PLAINTIFFS

v.

WILLIAM LISOWSKY and
UNITED STATES FOREST SERVICE                                    DEFENDANTS

## MEMORANDUM OPINION

This matter comes before the Court on the Plaintiffs' Motion for Summary Judgment

(Docket #18).  The Defendants have responded with a Cross Motion for Summary Judgment

(Docket #19).  The Plaintiffs have responded to the Defendants' Cross Motion (Docket #21), and

the Defendants' have replied to the Plaintiffs' response (Docket #24).  This matter is now ripe

for adjudication.  For the following reasons, the Plaintiffs' motion is **DENIED**, and the

Defendants' cross motion is **GRANTED**.

## BACKGROUND

The Land Between the Lakes National Recreation Area ("LBL") consists of a 40-mile

strip of land that comprises 170,000 acres in western Kentucky and middle Tennessee.  LBL was

designated as national resource area in 1963 when President John F. Kennedy assigned LBL to

be managed by the Tennessee Valley Authority ("TVA").  Between 1963-1969, residents who

lived in the LBL were gradually expelled from the area.  In October 1999, Congress transferred

jurisdiction of LBL from the TVA to the United States Forest Service ("Forest Service").   At the

time when Congress transferred the authority from the TVA to the Forest Service, LBL was

being managed pursuant to a Natural Resource Management Plan ("NRMP").  After the transfer,

Congress decided that in the interim the Forest Service could continue to use the NRMP implemented by the TVA until the Forest Service could implement its own plan within a practical time frame.  In June 2003, the Forest Service published a notice of intent to prepare an environmental impact statement ("EIS") for LBL, which would be a part of the Land Resource Management Plan ("LRMP") that would replace the NRMP in managing LBL.  Included in the EIS was plans for a project that deals with the area in question in this matter, Work Area 18.

Work Area 18 is in an area of land previously owned by residents who were expelled during the 1960's.  The Defendants have proposed a "Timber Harvest, Related Road Work, and Silviculture Treatments within Work Area 18," which would consist of: a timber harvest of 237 acres using a variety of harvest methods; timber stand improvement treatment using hand tools on 40 acres; road improvement on approximately 2.1 miles of pre-existing road to facilitate access to the timber harvest units; and prescribed burning on 893 acres.  The parties disagree on the potential results and impact of such a project: the Defendants assert that the project will create a young-growth forest habitat important for wild life species, which will benefit LBL, while harvesting only 7% of Work Area 18 and less than 0.2% of the total area of LBL; while the Plaintiffs argue that the Defendants' project proposal is a cover-up for timber sale, does hardly little improvement to the conditions as claimed by the Defendants, and violates the National Forest Management Act ("NFMA"), National Historic Preservation Act ("NHPA"), and the National Environmental Policy Act ("NEPA").  The Work Area 18 Project ("Project") was a part of the LBL LRMP adopted by the Forest Service in 2004.  The Plaintiffs filed their complaint seeking review of the Project on June 3, 2005.

**STANDARD**

Federal courts have jurisdiction over challenges under NEPA, NHPA and NFMA

pursuant to the Administrative Procedure Act ("APA"). *See Environmental Defense Fund v.*

*Tennessee Valley*, 468 F.2d 1164, 1171 (6th Cir.1972).  A Court cannot substitute its own

judgment for that of the agency, and need only determine whether the agency has adequately

reviewed the issue and taken a "hard look" at the environmental impact of its decision.

*Neighbors Organized to Insure a Sound Env't, Inc., v. McArtor*, 878 F.2d 174, 178 (6th Cir.1989)

 In looking at a federal agency's interpretation of a statute that it administers, the Court must first

ask "whether Congress has directly spoken to the precise question at issue." *Chevron U.S.A. v.*

*NRDC*, 467 U.S. 837, 842 (1984).  If the statute is silent or ambiguous with respect to the issue,

the Court must then determine whether the agency's interpretation was permissible under the

statute. *Id.* at 843.

Particular deference is given by the Court to an agency with regard to scientific matters

in its area of technical expertise. *Nat'l Wildlife Fed'n v. EPA*, 286 F. 3d 554, 560 (D.C. Cir.

2002).  Courts will not set aside a final agency action unless it is found to be "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §

706(2)(a); *Northeast Ohio Regional Sewer Dist. v. U.S. E.P.A.*, 411 F.3d 726, 731 (6th Cir.

2005); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402. 416 (1971).   In considering

whether an agency rule is "arbitrary and capricious," the Court may consider whether the agency

has relied on factors which Congress has not intended it to consider, entirely failed to consider

an important aspect of the problem, offered an explanation for its decision that runs counter to

the evidence before the agency, or is so implausible that it could not be ascribed to a difference

3

in view or the product of agency expertise. *Id.*  The party who brings the case that is scrutinized under APA review bears the burden of demonstrating that the actions of the agency were arbitrary and capricious. *Sierra Club v. Marita*, 46 F.3d 606, 619 (7th Cir. 1995).

Summary judgment is available under Fed. R. Civ. P. 56(c) if the moving party can establish that the "pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). [N]ot every issue of fact or conflicting inference presents a genuine issue of material fact."  *Street v. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  The test is "whether the party bearing the burden of proof has presented a jury question as to each element in the case."  *Hartsel v. Keys,* 87 F.3d 795, 799 (6th Cir. 1996).  The plaintiff must present more than a mere scintilla of the evidence.  To support his position, he must present evidence on which the trier of fact could find for the plaintiff.  *See id.* (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52 (1986)).  Mere speculation will not suffice to defeat a motion for summary judgment: "[t]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment.  A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate."  *Monette v. Electronic Data Systems Corp.,* 90 F. 3d 1173, 1177 (6th Cir. 1996).  Finally, while Kentucky state law is applicable to this case pursuant to *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), a federal court in a diversity action applies the standards of Fed. R. Civ. P. 56, not "Kentucky's summary

judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, Ky., 807 S.W.2d

476 (1991)." *Gafford v. General Electric Co.*, 997 F.2d 150, 165 (6th Cir. 1993).

## DISCUSSION

The Plaintiffs claim that the Project violates NEPA, NHPA and NFMA.  The Court will

analyze each argument individually to determine whether the project is in violation of any of the

three (3) acts.

### *Whether the Project violates NEPA*

Passed by Congress in 1969, the National Environmental Policy Act, 42 U.S.C. §4321,

was implemented in order to establish:

> a national policy which will encourage productive and enjoyable harmony between
> man and his environment; to promote efforts which will prevent or eliminate damage
> to the environment and biosphere and stimulate the health and welfare of man; to
> enrich the understanding of the ecological systems and natural resources important
> to the Nation; and to establish a Council on Environmental Quality.

NEPA requires all agencies to prepare an EIS before they undertake actions that may affect the

quality of the environment. 42 U.S.C. §4332(C).  This includes adequately disclosing, analyzing,

considering and addressing a proper set of alternatives to a proposed project. *Cherokee Forest*

*Voices v. U.S. Forest Service*, 2006 WL 1478543, *1 (6th Cir. 2006);  42 U.S.C. § 4332.  Before

an agency prepares an EIS, the agency may first prepare an environmental assessment ("EA"),

which is a concise public document that describes a project proposal, in order to determine

whether an EIS is necessary. 40 C.F.R. §1501.4(b).  After preparing an EA, an agency may

either prepare an EIS or make a "finding of no significant impact," otherwise known as a

"FONSI."

The Plaintiffs contend that the Project violates NEPA in six (6) different ways, including:

the Forest Service failed to consider the comments of former residents; the failure to provide an alternative that stresses historical or cultural significance of the action area; the EA prepared by the Defendants failed to include site-specific studies; the EA prepared by the Defendants does not consider the significant effects of the Project on forest interior birds within Work Area 18; the Mitigation Measures have inadequate support in the record; and that Work Area 18 requires an EIS, not a FONSI, because of its environmental significance to the area.  The Court will analyze each of these arguments, though the Court shall examine the first three (3) points under the premise of failure to reasonably consider other alternatives. *Kelley v. Selin*, 42 F.3d 1501, 1518-1519 (6th Cir. 1995).

## 1. The Consideration of Alternatives

In looking at what alternatives the Defendants could have considered, the Plaintiffs contend that the Forest Service needed to take into account the comments by former residents on how to conserve Work Area 18; that the three (3) alternatives examined by the Forest Service did not stress historical or cultural significance; and that the EA drafted by the Defendants failed to include site-specific studies.

"NEPA requires a federal agency to give a 'detailed statement...on...alternatives to the proposed action...' and to 'study, develop, and describe appropriate alternatives...'" *Headwaters, Inc. v. Bureau of Land Management, Medford Dist.*, 914 F.2d 1174, 1180 (9th Cir. 1990), *citing* 42 U.S.C. § 4332(2)(C) & (E); *California v. Block*, 690 F.2d 753, 766 (9th Cir.1982).  "NEPA aims not to identify actions that would violate environmental standards, but to force consideration of consequences and alternatives...and thus ensure that, even if a proposed action is legal...it will done in a way that minimizes unnecessary negative environmental effects." *U.S.*

6

*v. City of Detroit*, 329 F.3d 515, 530, n. 2 (6th Cir. 2003). "In deciding whether the [agency] acted arbitrarily by not considering certain alternatives, we remain mindful that an agency decision concerning which alternatives to consider is necessarily bound by a rule of reason and practicality." *Airport Neighbors Alliance, Inc. v. United States*, 90 F.3d 426, 432 (10th Cir.1996). "[A]n agency need not analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative...impractical or ineffective." *Id.* "Nor must an agency consider alternatives which are infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area." *Block*, 690 F.2d at 767.

In the instant matter, the Plaintiffs have not met their burden in demonstrating that the Defendants acted arbitrarily and capriciously in their consideration of reasonable alternatives. The suggestions submitted by the Plaintiffs do not offer concrete examples of how the Defendants should have acted throughout the course of considering alternatives.  Further, the record reflects that the Defendants did take into consideration the three (3) areas that the Plaintiffs allege are lacking.  The Defendants offered three (3) alternatives that did take into consideration the opinions of former residents, the historical and cultural resources of LBL, and offer reasonable studies to meet the reasonable consideration standard.  These included a no-action alternative and two (2) logging alternatives.

The Plaintiffs misconstrue reasonable consideration of alternatives with actually abiding by how the Plaintiffs feel the Forest Service should have acted.  However, the Forest Service need only to have looked into alternatives that relate to the project and consider the consequences of these alternatives.  The record reflects that the Defendants did just that.  Under NEPA, a Court will uphold the alternatives considered by an agency so long as they are

reasonable under the circumstances. *Save Our Cumberland Mountains v. Norton*, 297 F.Supp.2d 1042, 1051 (E.D. Tenn. 2003). The alternatives considered were reasonable in this instance. Accordingly, the Defendants reasonably considered alternatives to the Project.

### 2. The Significant Effects on Forest Interior Birds

The Plaintiffs assert that the Defendants did not consider the significant effects on forest interior birds in their EA when the Forest Service went ahead with its approval of the Project. In particular, the Plaintiffs contend that the Forest Service did not take into account that the results of the Project would lead to a more fragmented forest, which would mean less reproductive success for the forest interior birds. The Forest Service responded by arguing that it looked at the potential impact fragmentation would have of on Work Area 18 in regards to the forest interior birds as well as the impact the alternatives would have on them. The Forest Service determined that although the Project would "slightly lessen" the amount of suitable forest habitat after the completion of the project, in the long run the birds in the area would continue to benefit from the "Biosphere Reserve" that will not be affected by the Project and that the Project would not have a significant impact on the birds resulting from the forest fragmentation.

The Court agrees with the Defendants, in that the Forest Service not only took into consideration the effects the Project will have on forest interior birds located within Work Area 18, but was also forthcoming about the likely negative impact of the Project on forest interior birds. However, the Forest Service also concluded that this impact would bot be significant, and the Court concurs with the Defendants' analysis because the on-going progress of the biosphere reserve as well as the fact that very little of the land in LBL will be fragmented by the Project leaves the forest interior birds out of harms way. The Administrative Record ("AR") reflects

8

that the Forest Service took into consideration all of the necessary studies when reaching its decision, including reports referenced by the Plaintiffs in their motion for summary judgment. Accordingly, the Defendants reasonably considered the impact of the Project on forest interior birds and rightfully determined that the impact would not be significant.

### 3. The Appropriateness of the Mitigation Measures

Mitigation measures are "steps that can be taken to mitigate adverse environmental consequences." *Robertson v. Methow Valley Citizen Council*, 490 U.S. 332, 351 (1989). "Implicit in [NEPA's] demand that [an] agency prepare detailed statement on 'any adverse environmental effects which cannot be avoided should the proposal be implemented' is understanding that [an EIS] will discuss extent to which adverse effects can be avoided." *Id.* at 351-52. However, "NEPA does not require a fully developed plan detailing what steps will be taken to mitigate adverse environmental impacts." *Id.* at 351. "NEPA does not require that environmental assessments [EA's] include a discussion of mitigation strategies, even though regulations require discussion of means to mitigate adverse environmental impacts in environmental impact statements [EIS]." *Akiak Native Community v. U.S. Postal Service*, 213 F.3d 1140, 1147 (9th Cir. 2000).

The Plaintiffs argue that the Defendants have not abided by the management prescriptions proscribed by 36 C.F.R. 219,27(a), which requires the Defendants to conserve soil and water resources, while not allowing significant and/or permanent impairment of land productivity. In particular, the Plaintiffs contend that the EA has no reference to extraordinary measures or anything that indicates how the mitigation measures work to eliminate and/or limit all potential significant or permanent impairment in Work Area 18. The Plaintiffs also contend

that the Forest Service ignored the declaration of Kristi Hanson, a citizen who had monitored Work Area 4 in 1997, provided documents of some of the damage done by the logging activities, which the Plaintiffs claim are not addressed by the Defendants' EA.  Further, the Plaintiffs assert that in the area where the bulk of the Project will take place, the soil is subject to severe erosion. The Plaintiffs label the Forest Service's measures as "generic, programmatic, and vague."

In response to the Plaintiffs' assertions, the Forest Service argues that the EA states that the Project will adhere to the best management practices ("BMP") for "silviculture" activities, through continued monitoring based upon past experiences in dealing with timber harvests.  The Defendants further contend that the EA sufficiently addresses soil impact of the Project, including road improvements and ways to decrease in soil loss.  The Defendants do admit that the burns from the Project will remove a "limited amount" of ground cover, young trees, and shrubs, but that the "riparian canopy" would remain in tact and the ground cover would quickly return.  The Forest Services refers the Plaintiffs and the Court to the EA and AR, where the Defendants assert that together they more than sufficiently discuss the mitigation measures, including the efficacy of those measures and monitoring of them.  The Defendants ultimately state that the Plaintiffs have not refuted any of the findings by the Forest Service in regards to the proposed mitigation measures, but instead attack the depth of their coverage in the EA and AR, as well as the means used to reach their results.  The Court concurs with the Defendants that the Plaintiffs have not explicitly disproved the findings by the Forest Service, but instead critique their methods and their choice to not fully take into account and abide by the observations of a former resident.  As such, the mitigation measures, as listed by the Defendants, are appropriate for the Project.

As determined by the Sixth Circuit Court of Appeals in *McArtor*, the Court may only determine whether the Forest Service has taken a "hard look" at the impact of their activities in the Work Area 18 habitat.  *McArtor*, 878 F.2d at 178.  The AR indicates that the Defendants did more than merely take into consideration the future actions of the Project, but have offered concrete conclusions as to how they plan to initiate their proposed mitigation measures.  Rather than attack the proposed results, the Plaintiffs have called them "vague," in spite of the facts that the EA and AR provide sufficient details of their measures, and that an EA does not require as much detail in its description of mitigation measures.  Accordingly, the mitigation measures as offered by the Defendants are appropriate for the Project.

### 4. Whether the Project requires an EIS or an EA

The Plaintiffs contend that the Forest Service should have prepared an EIS (environmental impact statement) rather than an EA (environmental assessment) because the Project raises significant degradation questions to the human environmental factor, and that such negative effects may occur.  The decision regarding whether or not a government agency should have used an EIS or an EA is reviewed under an arbitrary and capricious standard. *Wetlands Action Network v. U.S. Army Corps of Engineers*, 222 F.3d 1105, 1114 (9th Cir. 2000)(citing *Northwest Environmental Defense Center v. Bonneville Power Administration*, 117 F.3d 1520, 1536 (9th Cir.1997)).  As indicated *supra*, the Court will look at several factors to determine whether or not an agency failed to consider an aspect of the problem, however, the burden is on the Plaintiff to demonstrate this failure. *See* 5 U.S.C. § 706(2)(a); *Northeast Ohio Regional Sewer Dist.*, 411 F.3d at 731; *Marita*, 46 F.3d at 619.

The Plaintiffs have asserted seven (7) reasons why the Defendants should have prepared

an EIS rather than an EA.  40 C.F.R. §1508.27(b).  The Defendants counter, arguing that not only have the Plaintiffs not met their burden under the arbitrary and capricious standard, but also that the FONSI and other sources have sufficiently stated in the AR that the Project will not have a significant effect on the quality of human environment.  The Court address each of the seven (7) reasons separately.

### I. Unique Characteristics of Work Area 18

The Plaintiffs argue that the Project area has unique characteristics, and that therefore under 40 C.F.R. §1508.27(b)(3), it requires an EIS.  The Plaintiffs contend that the area: was a wildlife refuge in 1938; that its history can be traced back to the 1700's; and that Work Area 18 is also located within an Environmental Education Area.  In response, the Defendants assert that: the EA included a sufficient discussion of the historic and cultural resources in the area; at least two (2) field studies were conducted so that the Defendants avoided these resources in its unit layout of Project work; and that the State Historic Preservation Officer ("SHPO") determined that no historic properties would be burdened by the Project.  Based on the AR, the record reflects that the Forest Service not only sufficiently looked into the historic and cultural aspects of Work Area 18 before deciding to create the EA, but also that the alleged harm that the Plaintiffs claim may occur has not been demonstrated.  As such, the Plaintiffs have not met their burden in showing that the Defendants acted arbitrarily and capriciously.  Accordingly, Work Area 18 does not have unique characteristics that require an EIS.

### II. Controversy Over the Avoidance of Citizen Concerns

The Plaintiffs assert that the Defendants have continually avoided citizens near the Work 18 Area who were promised no commercialization once the land was obtained by eminent

domain, and that such an avoidance constitutes a controversy under 40 C.F.R. §1508.27(b)(4).

The Plaintiffs contend that former residents were removed from the land with the understanding

that the land would be preserved and not commercially exploited.  For purposes of NEPA, a

"federal action is controversial if a substantial dispute exists as to [its] size, nature or effect.'"

*Wetlands Action Network*, 222 F.3d at 1122 (quoting *LaFlamme v. F.E.R.C.* 852 F.2d 389, 400-

01 (9th Cir. 1988)).  "[T]o require an impact statement whenever a threshold determination

dispensing with one is likely to face a court challenge would surrender the determination to

opponents of a federal action, no matter whether major or not, nor how insignificant its

environmental effect might be." *Rucker v. Willis*, 484 F.2d 158, 162 (4th Cir. 1973)(interpreting

the meaning of controversy within federal environmental cases).

Here, the Plaintiffs do not challenge the size, nature of effect of the Project, but contend

that a controversy exists over an alleged promise made by the government to former residents.

Though the Court does not explicitly deny that such a promise was made, a breaking of such a

promise does not amount to a controversy under NEPA because it does not address the specifics

of the Project in regards to size, nature or effect.  Despite the sincerity of the former residents'

contention, the Plaintiffs have not met their burden in showing that the Defendants acted

arbitrarily and capriciously.  Accordingly, the dispute between the residents as to

commercialization does not amount to a substantial controversy under NEPA.

III. Unique and Unknown Risks Associated with the Historical Value of Work Area 18

The Plaintiffs contend that the logging of Work Area 18 presents unknown risks to its

historical value because of its geography and isolation between the rivers, and thus violates 40

C.F.R. §1508.27(b)(5)-(6).  The Plaintiffs argue that there has not been a survey of the original

wagon roads, and that the Defendants have not fully considered the historical and cultural qualities of the area.  As determined *supra*, the Court held that the Defendants had sufficiently evaluated the historical and cultural consequences of logging in Work Area 18.  Further, the Forest Service notes that it has much experience in dealing with the proposed activities, and has taken into consideration the appropriate risks.  As such, the Plaintiffs have not met their burden in showing that the Defendants acted arbitrarily and capriciously.  Accordingly, the Project will not be a detriment to any known or unknown risks in Work Area 18.

### IV. A Look at the Cumulative Effects on Neotropical Migratory Birds

As determined *supra*, the Court found that the Defendants has sufficiently taken into consideration the effects of the Project on forest interior birds in the Work 18 Area.  The AR also reflects that the Defendants have addressed the concerns of neotropical birds as well.  As such, the Plaintiffs have not met their burden in showing that the Defendants acted arbitrarily and capriciously.  Accordingly, the Court finds that the Forest Service took an appropriate look at the cumulative effects under 40 C.F.R. §1508.27(b)(7).

### V. The Historical Designation of Work Area 18

The Plaintiffs assert that the Forest Service acted arbitrarily and capriciously by not considering the cumulative impact on cultural resources, in violation of 40 C.F.R. §1508.27(b)(8).  The Plaintiffs allege that the Defendants failed to consider the impact heavy construction equipment could have on the resources within Work Area 18.  As determined *supra*, the Court found that the Forest Service conducted a sufficient analysis on the potential harmful effects the Project could have on the area.  The Plaintiffs offer only speculation as to what may occur, but do not provide what the Defendants should be looking for in as far as the harm caused

14

by the heavy equipment, or what authority and/or precedent requires them to do so.  As such, the

Plaintiffs have not met their burden in showing that the Defendants acted arbitrarily and

capriciously.  Accordingly, the Court finds that the Forest Service did not violate 40 C.F.R.

§1508.27(b)(8).

## VI. LBL Protection Act

The Plaintiffs assert that the logging of Work Area 18 violates the LBL Protection Act

because it does not provide recreation, conserve fish and wildlife, or provide for diversity of

plants. 16 U.S.C. 460lll-11(b)(2).  However, as pointed out by the Defendants, the Federal

government had previously approved logging in Work Area 18 three (3) previous times, and

none of these instances violated the LBL Protection Act.  Further, the logging of Work Area 18

does not necessarily mean that all other programs implemented by the Federal government cease

at that time, meaning that it is possible for the Forest Service to meet their goals while permitting

minimal logging in the area.  As such, the Plaintiffs have not met their burden in showing that

the Defendants acted arbitrarily and capriciously.  Accordingly, the Court finds that the Forest

Service did not violate 40 C.F.R. §1508.27(b)(10).

## VII. Hibernation of the Indiana and Gray Bats under the ESA

The Plaintiffs claim that the EA does not address the potential swarming site within

Work Area 18 for a species of endangered Indiana and Gray bats.  The Plaintiffs cite a 1999

letter from the Fish & Wildlife Service ("FWS") addressed to the TVA that states the FWS

cannot concur with the initial evaluation of the TVA that the bats in question will not be affected

by forest management activities.  The Plaintiffs suggest that the Defendants failed to conduct a

recent field study to determine whether or not the Project could affect the bats within LBL.

15

Aside from relying on a seven (7) year old study themselves, the Plaintiffs have not specified if the bats use or have used Work Area 18 as a habitat, but simply provide that they *may* use part of LBL.  As Plaintiffs are aware, LBL consists of 170,000 acres, expands over 40 miles and covers two different states.  Work Area 18 consists of 237 acres, covering less than 0.2% of the total acreage of LBL.  Without indicating whether or not the bats would have a strong likelihood to use Work Area 18 or any of its surrounding areas for swarming or hibernation purposes, the Court sees no reason why the Forest Service would be required to study this matter. As such, the Plaintiffs have not met their burden in showing that the Defendants acted arbitrarily and capriciously.  Accordingly, the Court finds that the Forest Service did not violate the ESA.

Accordingly, the filing of the EA by the Forest Service rather than an EIS was appropriate. *See Sierra Club v. Slater*, 120 F.3d 623, 635 (6th Cir. 1997).

### *Whether the Project violates NHPA*

In 1966, Congress enacted the National Historic  Preservation Act. ("NHPA") in order to ensure "that the spirit and direction of the Nation are founded upon and reflected in its historic past...[and]...that the historical and cultural foundations of the Nation should be preserved." 16 U.S.C. §470; *South Hill Neighborhood Ass'n v. Romney*, 421 F.2d 454, 459 (6th Cir. 1969). §470(f) of the NHPA states:

> [t]he head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic

Preservation established under part B of this subchapter a reasonable opportunity to comment with regard to such undertaking.

Section 106 of NHPA, 16 U.S.C. § 470f, provides that a federal agency "having direct or indirect jurisdiction over a proposed federal or federally-assisted undertaking," shall, prior to approving the use of any federal funds, "take into account the effect of the undertaking on any site that is included in the National Register" and upon making its findings "shall afford the Advisory Council on Historic Preservation a reasonable opportunity to comment with regard to such undertaking."  Section 110(f) provides that prior to approving any federal undertaking affecting a national historic landmark, "the head of the responsible federal agency shall, to the maximum extent possible, undertake such planning and actions as may be necessary to minimize harm to such landmark and shall afford the Advisory Council a reasonable opportunity to comment on the undertaking." *See Historic Preservation Guild of Bay View v. Burnley*, 896 F.2d 985, 987-88 (6th Cir. 1989).  If the federal agency determines that no impact and/or affect on historic properties shall take place, the agency must share its findings with the State Historic Preservation Officer ("SHPO") and the public. 36 C.F.R. §800.4(d)(1).  Upon the determination by the SHPO, an agency may proceed so long as the SHPO concurs with their findings of "no impact and/or affect" on the area in question. 36 C.F.R. §800.4(d)(1)(i).

The Plaintiffs contend that the Forest Service did not properly make a "reasonable and good faith effort" to identify all of the historical properties within Work Area 18.  In particular, the Plaintiffs assert that the Defendants never determined if LBL is eligible for inclusion in the National Register using Bulletin #38, which outlines the criteria for traditional cultural places. The Plaintiffs argue that by using the Heritage Resource Management Plan rather than the criteria under Bulletin #38, the Forest Service snubs the heritage and tradition of former

17

residents in the area.

As mentioned *supra*, the Forest Service conducted at least two (2) studies, in 1998 and 1999, analyzing the potential impacts of the Project on cultural and political resources. Both studies determined there would be no effect on historical properties. The Forest Service turned this information over to the Kentucky SHPO who concurred with the findings of the studies and the conclusion that with respect to Work Area 18, the Project would have no affect on historical properties. The Defendants argue that the Plaintiffs are attempting to redefine the methods by which an agency seeks approval by attempting to change the process from determining whether or not there is an affect on historical properties to whether a property is potentially eligible for the National Register. In particular, the Defendants claim that the Plaintiffs wish to have the Forest Service abide by the opinion draft paper of Plaintiff David Nickell and Dr. Thomas King, PhD, the latter of whom co-authored Bulletin #38. As correctly noted by the Defendants, the Forest Service is entitled to deference with regard to scientific matters. *Nat'l Wildlife Fed'n*, 286 F. 3d at 560. The Court finds that the Defendants did not have to abide by Bulletin #38 when conducting their studies under NHPA.

Further, contrary to the claims of the Plaintiffs, the Defendants point out that they did take the Nickell and King paper into consideration as evidenced by the AR. The Defendants properly abided by the process prescribed by Section 106 of NHPA, and did not have to abide by Bulletin 38. Accordingly, the Defendants did not violate NHPA.

### Whether the Project violates NFMA and LBL Protection Act

The Plaintiffs contend that the Project violates NFMA, 16 U.S.C. §1604, because the Project, as implemented and authorized by the Forest Service: failed to comply with the 1994

18

TVA Plan and NFMA because it did not let its decision to implement the Project be subject to public scrutiny after the LRMP was approved; did not analyze the importance of recreation; and failed to value the wildlife of Work Area 18.  The Plaintiffs' argument focuses on the transfer of LBL from the TVA to the Forest Service in 1999.  When the transfer took place, Congress enacted the LBL Protection Act ("LBL Act"), in order to assist the transfer between the two government entities. 16 U.S.C. §460*lll*-1.  In particular, the LBL Act required the Forest Service to prepare a Land and Resource Management Plan ("LRMP") after the transfer, and until it could do so it was to use the existing TVA Natural Resource Management Plan ("NRMP") until the Forest Service could "practically" prepare the LRMP.  However, the EA for the Project was issued prior to the adoption of the LRMP, so the Forest Service looked to the TVA's NRMP.  In their response, the Plaintiffs assert that regardless of whether the Forest Service acted under the guise of the TVA's NRMP or the LRMP, the Project violates the LBL Act or the NFMA, and the Forest Service did not take into appropriate consideration the recreation of the area and the value of the wildlife.  The Court will analyze these three (3) allegations separately.

**1. Project Modification after the Adoption of the LRMP in December 2004**

The Defendants argue that the Project did not have to be modified after the adoption of the LRMP.  They not only cite the Area Supervisor's determination that although the Project was devised under the TVA's NRMP, the Project was consistent with the December 2004 LRMP and it was unnecessary to modify its analysis and decision, but also the Record of Decision ("ROD") for the LRMP that explained the Project did not have to be altered in lieu of passing the LRMP. The Court concurs with the Defendants, holding that the AR reflects that the appropriate authorities used their independent discretion to determine that the Project need not change

19

despite the adoption of the LRMP in December 2004.  Prior to the passage of the LRMP, the

Project had gone through the appropriate phase for public notice and comment, and the Forest

Service acted according to the decision of the Area Supervisor and ROD.  Accordingly, the

Forest Service was not required to modify the Project after the adoption of the LRMP.

### 2. The Importance of Recreation when focusing on Resource Values

The Plaintiffs argue that the Forest Service violated NFMA by not considering the

multiple uses of the Work Area 18 before devising the Project.  Specifically, the Plaintiffs assert

that the Forest Service should have considered the recreation uses of the area under 16 U.S.C.

§1600(3), rather than focusing only on timber.  The language in question under NFMA,  16

U.S.C. §1604(e), which states:

> (e) Required assurances
> In developing, maintaining, and revising plans for units of the National Forest
> System pursuant to this section, the Secretary shall assure that such plans--
> (1) provide for multiple use and sustained yield of the products and services obtained
> there from in accordance with the Multiple-Use Sustained-Yield Act of 1960 [16
> U.S.C.A. §§ 528-531], and, *in particular, include coordination of outdoor
> recreation, range, timber, watershed, wildlife and fish, and wilderness*; and
> (2) determine forest management systems, harvesting levels, and procedures in the
> light of all of the uses set forth in subsection (c)(1) of this section, the definition of
> the terms "multiple use" and "sustained yield" as provided in the Multiple-Use
> Sustained-Yield Act of 1960, and the availability of lands and their suitability for
> resource management. (emphasis added).

The Defendants contend that the language of §1604(e) is discretionary in nature, and cite

the Ninth Circuit Court of Appeals case of *Perkins v. Bergland*, where the Court noted that

multiple-use mandates such as the language of §1604(e) "breathes discretion at every pore."

*Perkins v. Bergland*, 608 F.2d 803, 806 (9th Cir. 1979) (*quoting Strickland v. Morton*, 519 F.2d

467, 469 (9th Cir. 1975)).  Though the language of the statute does not clearly express whether

or not the Forest Service should use their discretion for each and every project when including

the listed the factors, the goals of the Project, as noted by the Defendants, do in fact go not only to timber, but also support other goals for LBL including wildlife through habitat support, environmental education and gaming.  Accordingly, the Defendants did not violate NFMA by not focusing on recreation.

### 3. The Value of Wildlife in Work Area 18

The Plaintiffs contend that the Forest Service failed to adequately monitor and consider the relationship of wildlife population numbers to habitat changes, which violates NFMA.  In particular, the Plaintiffs assert that the Forest Service failed to list the impacts for bats, frogs, salamanders, and other species within Work Area 18.  The Plaintiffs claim that the Defendants merely collected data on the species in the area, but did not fully address and monitor the relationship of habitat changes to particular species through a population survey.

The Forest Service argues that they did not have to examine the value of wildlife in Work Area 18 with as much detail as alleged by the Plaintiffs because the Forest Service was only required to examine the Evaluation Species ("ES") included in the NRMP, rather than "Management Indicator of Species," as what is essentially contended by the Plaintiffs.  The Defendants claim that their reliance on the ES was appropriate under the LBL Act until the LRMP was adopted.  The Forest Service argues that the ES that was implement served in a similar role as an MIS.  The Forest Service also notes that its analysis of wildlife value in Work Area 18 was not as limited as the Plaintiffs suggest, and included amphibians and reptile communities, as well as neo-tropical birds, white-tailed deer, bats, beetles, and other bird species.  The analysis conducted by the Forest Service included an examination of the habitat requirements for the species, as well as how their habitats would be impacted by the Project.

21

The Plaintiffs have not cited any authority to support their argument that the Forest Service needed to conduct a more thorough analysis of the wildlife species than what was already listed in the AR.  The Plaintiffs have instead attacked the degree in which the Forest Service analyzed the impact of the Project on wildlife species within Work Area 18, but have not provided any scale to measure what should have been required from the Defendants during its analysis.  The Defendants cite the Seventh Circuit Court of Appeals opinion of *Indiana Forest Alliance v. U.S. Forest Service*, where the Court held that the Forest Service was allowed to use its own methodology unless it was irrational, and that the Forest Service need not conduct a population survey under NFMA regulations. *Indiana Forest Alliance v. U.S. Forest Service*, 325 F.3d 851, 863 (7th Cir. 2003) (citing *Inland Empire v. United States Forest Service*, 88 F.3d 754, 762-63 (9th Cir.1996); *see also* 5 U.S.C.A. § 706(2)(A).  The Plaintiffs have not claimed that the methods used by the Forest Service were irrational, only not sufficient enough.  As such, the Plaintiffs have not met their burden.  Further, the Plaintiffs have not identified that any of the wildlife in Work Area 18 are listed in any Forest Framework that requires a population survey, yet insist that the listed wildlife do without offering any support to their claims. *See Earth Island Institute v. U.S. Forest Service*, 442 F.3d 1147, 1173 (9th Cir. 2006).  As such, the Forest Service adequately monitored and surveyed the wildlife species within Work Area 18.  Accordingly, the Forest Service did not violate NFMA.

## CONCLUSION

For the foregoing reasons, the Plaintiff's motion for summary judgment is **DENIED**, and the Defendants' cross motion for summary judgment is **GRANTED**.

22